JS 44   (Rev. 09/11)

# CIVIL COVER SHEET

The JS 44 civil coversheet and the information contained herein neither replace nor supplement the filing and service of pleadngs or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States inSeptember 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| IRVIN PHILLIPS et al. | NATIONAL FOOTBALL LEAGUE |

**(b)**  County of Residence of First Listed Plaintiff __Florida__
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant __Pennsylvania__
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)**  Attorneys *(Firm Name, Address, and Telephone Number)*
Anthony Tarricone, KREINDLER & KREINDLER LLP, 277 Dartmouth Street, Boston, MA 02116

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION   *(Place an "X" in One Box Only)*

- ❏ 1  U.S. Government Plaintiff
- ❏ 2  U.S. Government Defendant
- ❏ 3  Federal Question *(U.S. Government Not a Party)*
- ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT   *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 365 Personal Injury - Product Liability | ❏ 690 Other | ❏ 423 Withdrawal 28 USC 157 | ❏ 400 State Reapportionment |
| ❏ 130 Miller Act | ❏ 315 Airplane Product Liability | ❏ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ❏ 410 Antitrust |
| ❏ 140 Negotiable Instrument | ❏ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ❏ 430 Banks and Banking |
| ❏ 150 Recovery of Overpayment & Enforcement of Judgment | ❏ 330 Federal Employers' Liability | | | ❏ 820 Copyrights | ❏ 450 Commerce |
| ❏ 151 Medicare Act | ❏ 340 Marine | ❏ 368 Asbestos Personal Injury Product Liability | | ❏ 830 Patent | ❏ 470 Racketeer Influenced and Corrupt Organizations |
| ❏ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ❏ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ❏ 840 Trademark | ❏ 480 Consumer Credit |
| ❏ 153 Recovery of Overpayment of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 370 Other Fraud | ❏ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ❏ 490 Cable/Sat TV |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle Product Liability | ❏ 371 Truth in Lending | ❏ 720 Labor/Mgmt. Relations | ❏ 861 HIA (1395ff) | ❏ 850 Securities/Commodities/ Exchange |
| ❏ 190 Other Contract | ❏ 360 Other Personal Injury | ❏ 380 Other Personal Property Damage | ❏ 740 Railway Labor Act | ❏ 862 Black Lung (923) | ❏ 890 Other Statutory Actions |
| ❏ 195 Contract Product Liability | ❏ 362 Personal Injury - Med. Malpractice | ❏ 385 Property Damage Product Liability | ❏ 751 Family and Medical Leave Act | ❏ 863 DIWC/DIWW (405(g)) | ❏ 891 Agricultural Acts |
| ❏ 196 Franchise | | | ❏ 790 Other Labor Litigation | ❏ 864 SSID Title XVI | ❏ 893 Environmental Matters |
| | | | ❏ 791 Empl. Ret. Inc. Security Act | ❏ 865 RSI (405(g)) | ❏ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | | ❏ 896 Arbitration |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights | ❏ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ❏ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ❏ 220 Foreclosure | ❏ 441 Voting | **Habeas Corpus:** | | ❏ 870 Taxes (U.S. Plaintiff or Defendant) | ❏ 950 Constitutionality of State Statutes |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment | ❏ 530 General | | ❏ 871 IRS—Third Party 26 USC 7609 | |
| ❏ 240 Torts to Land | ❏ 443 Housing/ Accommodations | ❏ 535 Death Penalty | **IMMIGRATION** | | |
| ❏ 245 Tort Product Liability | ❏ 445 Amer. w/Disabilities - Employment | ❏ 540 Mandamus & Other | ❏ 462 Naturalization Application | | |
| ❏ 290 All Other Real Property | ❏ 446 Amer. w/Disabilities - Other | ❏ 550 Civil Rights | ❏ 463 Habeas Corpus - Alien Detainee (Prisoner Petition) | | |
| | ❏ 448 Education | ❏ 555 Prison Condition | ❏ 465 Other Immigration Actions | | |
| | | ❏ 560 Civil Detainee - Conditions of Confinement | | | |

*(360 Other Personal Injury marked with ☒)*

## V. ORIGIN   *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ❏ 2  Removed from State Court
- ❏ 3  Remanded from Appellate Court
- ❏ 4  Reinstated or Reopened
- ❏ 5  Transferred from another district *(specify)*
- ❏ 6  Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1332
Brief description of cause:
Other personal injury

## VII. REQUESTED IN COMPLAINT:

❏ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:**  ☒ Yes   ❏ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE  The Honorable Anita Brody
DOCKET NUMBER  12-md-02323-AB

DATE
11/13/2013

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____

JS 44 Reverse  (Rev. 09/11)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.      (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.      Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.CP., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.      Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.      Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.      Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.      Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause **Do not cite jurisdictional statutes unless diversity.**      Example:      U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

**VII.      Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.      Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

## UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: 3319 Fauna Street, Sarasota, FL 34235

Address of Defendant: 280 Park Avenue, New York, NY 10017

Place of Accident, Incident or Transaction: _____
*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))     Yes☐   No☐

Does this case involve multidistrict litigation possibilities?     Yes☒   No☐

*RELATED CASE, IF ANY:*

Case Number: 12-md-02323    Judge Hon. Anita Brody    Date Terminated: N/A

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
   Yes☐   No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
   Yes☐   No☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
   Yes☐   No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
   Yes☐   No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☒ All other Diversity Cases
    (Please specify) _____

### ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, Anthony Tarricone _____, counsel of record do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE: 11/13/2013 _____     _____     _____
                              Attorney-at-Law                                        Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: _____     _____     _____
                                     Attorney-at-Law                                Attorney I.D.#

CIV. 609 (5/2012)

## UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: 3319 Fauna Street, Sarasota, FL 34235

Address of Defendant: 280 Park Avenue, New York, NY 10017

Place of Accident, Incident or Transaction: _____

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))   Yes ☐   No ☐

Does this case involve multidistrict litigation possibilities?   Yes ☒   No ☐

*RELATED CASE, IF ANY:*

Case Number: 12-md-02323   Judge Hon. Anita Brody   Date Terminated: N/A

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
   Yes ☐   No ☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
   Yes ☐   No ☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
   Yes ☐   No ☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
   Yes ☐   No ☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☒ All other Diversity Cases
   (Please specify) _____

## ARBITRATION CERTIFICATION

*(Check Appropriate Category)*

I, Anthony Tarricone , counsel of record do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE: 11/13/2013   _____   _____
                     Attorney-at-Law                Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: _____   _____   _____
                            Attorney-at-Law                Attorney I.D.#

CIV. 609 (5/2012)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| IRVIN PHILLIPS et al. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| NATIONAL FOOTBALL LEAUGE | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.        ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.                ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                         ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court.  (See reverse side of this form for a detailed explanation of special
    management cases.)                                                            (X)

(f) Standard Management – Cases that do not fall into any one of the other tracks.   ( )


| | | |
|---|---|---|
| November 13, 2013 | _signature_ | Plaintiff |
| **Date** | **Attorney-at-law** | **Attorney for** |
| (617) 424-9100 | (617) 424-9120 | atarricone@kreindler.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

### Civil Justice Expense and Delay Reduction Plan
### Section 1:03 - Assignment to a Management Track

(a)         The clerk of court will assign cases to tracks (a) through (d) based on the initial pleading.

(b)         In all cases not appropriate for assignment by the clerk of court to tracks (a) through (d), the plaintiff shall submit to the clerk of court and serve with the complaint on all defendants a case management track designation form specifying that the plaintiff believes the case requires Standard Management or Special Management.  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

(c)         The court may, on its own initiative or upon the request of any party, change the track assignment of any case at any time.

(d)         Nothing in this Plan is intended to abrogate or limit a judicial officer's authority in any case pending before that judicial officer, to direct pretrial and trial proceedings that are more stringent than those of the Plan and that are designed to accomplish cost and delay reduction.

(e)         Nothing in this Plan is intended to supersede Local Civil Rules 40.1 and 72.1, or the procedure for random assignment of Habeas Corpus and Social Security cases referred to magistrate judges of the court.

### SPECIAL MANAGEMENT CASE ASSIGNMENTS
### (See §1.02 (e) Management Track Definitions of the
### Civil Justice Expense and Delay Reduction Plan)

Special Management cases will usually include that class of cases commonly referred to as "complex litigation"  as that term has been used in the Manuals for Complex Litigation.  The first manual was prepared in 1969 and the Manual for Complex Litigation Second, MCL 2d was prepared in 1985.  This term is intended to include cases that present unusual problems and require extraordinary treatment.  See §0.1 of the first manual.  Cases may require special or intense management by the court due to one or more of the following factors:  (1) large number of parties; (2) large number of claims or defenses; (3) complex factual issues; (4) large volume of evidence; (5) problems locating or preserving evidence; (6) extensive discovery; (7) exceptionally long time needed to prepare for disposition; (8) decision needed within an exceptionally short time; and (9) need to decide preliminary issues before final disposition.  It may include two or more related cases.  Complex litigation typically includes such cases as antitrust cases; cases involving a large number of parties or an unincorporated association of large membership; cases involving requests for injunctive relief affecting the operation of large business entities; patent cases; copyright and trademark cases; common disaster cases such as those arising from aircraft crashes or marine disasters; actions brought by individual stockholders; stockholder's derivative and stockholder's representative actions; class actions or potential class actions; and other civil (and criminal) cases involving unusual multiplicity or complexity of factual issues.  See §0.22 of the first Manual for Complex Litigation and Manual for Complex Litigation Second, Chapter 33.

## UNITED STATES DISTRICT COURT
## EASTERN DISCTRICT OF PENNSYLVANIA

```
-------------------------------------------------------------------X
```

| | |
|---|---|
| IRVIN PHILLIPS, WENDELL CASON, LOVETT PURNELL, BRUCE ANDERSON, WALTER LANDERS and his wife MARY LANDERS, RAY PINION and his wife LYNELL PINION, GEORGE ST. JAMES formerly known as GEORGE SHORTHOSE, GEORGE DANIEL LANPHEAR and his wife ALICE SHEA, ATHONY HENTON and his wife KIMBERLY HENTON, MARVIN HARVEY, JAMES PHILLIPS, DALE DAWSON, PAUL BRADFORD and his wife MARGARITA BRADFORD, NATHANIEL JAMES, JAMES KALAFAT and his wife TONYA KALAFAT, CLEO SIMMONS and his wife GWEN SIMMONS, | CASE NO.: |
| | **COMPLAINT** |
| | **Plaintiffs Demand Trial By Jury** |
| Plaintiffs, | |
| -against- | |
| NATIONAL FOOTBALL LEAGUE, | |
| Defendant. | |

```
-------------------------------------------------------------------X
```

## COMPLAINT

Plaintiffs set forth in the case caption above (collectively "Plaintiffs"), by their attorneys

Kreindler and Kreindler LLP, as and for their complaint against defendant NATIONAL

FOOTBALL LEAGUE ("NFL" or "Defendant") respectfully allege as follows:

### NATURE OF THE ACTION

1.      Plaintiffs bring the present personal injury claims predicated on the NFL's

misconduct regarding the long-term consequences of multiple concussions and repeated sub-

concussive traumatic brain injuries suffered during their NFL careers.  For well over half a

century, medical evidence has linked concussions and long-term neurological problems, and

specialists in brain trauma have been warning about the risks of permanent brain damage from

repetitive concussive events.  The NFL, as the organizer, marketer and face of a professional sport in which head trauma is a regular and repeated occurrence voluntarily undertook a duty to research the effects of concussions and traumatic brain injury and educate players about the risks associated with a career in professional football.  The NFL was aware of the risks of repeated head trauma and multiple concussive events, but nevertheless chose to ignore, misrepresent to and deliberately conceal from players and their families the risk of serious long-term health effects.  Plaintiffs, in turn, relied on the league's deceptive statements and efforts to conceal medical evidence, resulting in the belief  that concussive events did not present serious life-altering risks and thereby agreeing to return to play prematurely, and to continue to play for years despite repeated concussions and traumatic brain injury.

2.      The NFL's active and purposeful concealment and misrepresentation of the severe neurological risks of repeated head trauma and multiple concussive events exposed players, including Plaintiffs, to dangers they could have avoided had the League provided them with truthful and accurate information.  Many players, including Plaintiffs described below, now suffer symptoms of severe and permanent brain damage as a result of the NFL's wrongful acts and omissions, and have suffered serious permanent debilitating injuries as a result of the repeated concussions and blows to the head they sustained during their careers, due to the NFL's wrongful conduct.

## JURISDICTION AND VENUE

3.      Jurisdiction is proper in court pursuant to 28 U.S.C. § 1332(a), (b) and (d).  All of Plaintiffs are citizens of a different state from that of Defendant.  The amount in controversy exceeds $75,000, exclusive of interest and costs for each Plaintiff.  The amount in controversy for all Plaintiffs in this mass action exceeds $5,000,000, exclusive of interest and costs.  and

Plaintiffs are part of a class of former NFL players whose claims have all been transferred to this district as part of a multi-district litigation.

4.      This Court has personal jurisdiction over Defendant because it conducts substantial and continuous business in the Commonwealth of Pennsylvania.

5.      Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) and (b)(2) in that a substantial part of the events or omissions that give rise to the claims occurred within the Commonwealth of Pennsylvania and this district, and the Defendants conduct a substantial part of their business within this district.

6.      Joinder of the claims of Plaintiffs in this complaint is permissible pursuant to Fed. R. Civ. P. 20(a) in that the claims alleged herein arise out of the same series of occurrences, and involve common questions of law and fact.

## THE PARTIES

### IRVIN PHILLIPS

7.      Plaintiff IRVIN PHILLIPS is a citizen and resident of Florida.

8.      Plaintiff IRVIN PHILLIPS played in the NFL as a defensive back from the 1981 through 1983 seasons.  During the 1981 season, IRVIN PHILLIPS played with the San Diego Chargers, and during the 1982 and 1983 seasons he played with the Los Angeles Raiders.

9.      Throughout his career as a professional football player IRVIN PHILLIPS suffered repeated hits and blows to the head.

10.     As a result of the head trauma suffered during his playing career IRVIN PHILLIPS suffers from symptoms associated with multiple traumatic brain injury and CTE.

11.     IRVIN PHILLIPS is also at heightened risk of developing further adverse neurological symptoms in the future.

12.     As discussed in greater detail below, the NFL consistently denied any relationship between symptoms of CTE, or other neurodegenerative disorders, and repeated concussions or sub-concussive blows suffered while playing NFL football.  These denials and active refutation on the part of NFL agents, constituted fraud (unintentional or intentional) and concealment of information directly related to IRVIN PHILLIPS's causes of action.

13.     Because of the continuing tort of concealment and fraud carried out by the Defendant, it was not until 2013, that IRVIN PHILLIPS had any reason to consider that repeated head impacts suffered during his career were the cause of his present symptoms and that his symptoms were caused by conduct, misconduct and omissions of the Defendant.

### WENDELL CASON

14.     Plaintiff WENDELL CASON is a citizen and resident of California.

15.     Plaintiff WENDELL CASON played in the NFL as a defensive back for the Altanta Falcons from the 1985 through 1987 seasons.

16.     Throughout his career as a professional football player WENDELL CASON suffered repeated hits and blows to the head.

17.     As a result of the head trauma suffered during his playing career WENDELL CASON suffers from symptoms associated with multiple traumatic brain injury and CTE.

18.     WENDELL CASON is also at heightened risk of developing further adverse neurological symptoms in the future.

19.     As discussed in greater detail below, the NFL consistently denied any relationship between symptoms of CTE, or other neurodegenerative disorders, and repeated concussions or sub-concussive blows suffered while playing NFL football.  These denials and active refutation

on the part of NFL agents, constituted fraud (unintentional or intentional) and concealment of information directly related to WENDELL CASON's causes of action.

20.     Because of the continuing tort of concealment and fraud carried out by the Defendant, it was not until 2013, that WENDELL CASON had any reason to consider that repeated head impacts suffered during his career were the cause of his present symptoms and that his symptoms were caused by conduct, misconduct and omissions of the Defendant.

### LOVETT PURNELL

21.     Plaintiff LOVETT PURNELL is a citizen and resident of Florida.

22.     Plaintiff LOVETT PURNELL played in the NFL as a tight end from the 1996 through 1999 seasons.  During the 1996 and 1998 seasons LOVETT PURNELL played with the New England Patriots, and during the 1999 season he played with the Baltimore Ravens.

23.     Throughout his career as a professional football player LOVETT PURNELL suffered repeated hits and blows to the head.

24.     As a result of the head trauma suffered during his playing career LOVETT PURNELL suffers from symptoms associated with multiple traumatic brain injury and CTE.

25.     LOVETT PURNELL is also at heightened risk of developing further adverse neurological symptoms in the future.

26.     As discussed in greater detail below, the NFL consistently denied any relationship between symptoms of CTE, or other neurodegenerative disorders, and repeated concussions or sub-concussive blows suffered while playing NFL football.  These denials and active refutation on the part of NFL agents, constituted fraud (unintentional or intentional) and concealment of information directly related to LOVETT PURNELL's causes of action.

27.    Because of the continuing tort of concealment and fraud carried out by the Defendant, it was not until 2013, that LOVETT PURNELL had any reason to consider that repeated head impacts suffered during his career were the cause of his present symptoms and that his symptoms were caused by conduct, misconduct and omissions of the Defendant.

**BRUCE ANDERSON**

28.    Plaintiff BRUCE ANDERSON is a citizen and resident of Oregon.

29.    Plaintiff BRUCE ANDERSON played in the NFL as a defensive lineman from the 1966 through 1970 seasons.  During the 1966 season BRUCE ANDERSON played with the Los Angeles Rams, during the 1967 through 1969 seasons he played with the New York Giants, and during the 1970 season he played with the Washington Redskins.

30.    Throughout his career as a professional football player BRUCE ANDERSON suffered repeated hits and blows to the head.

31.    As a result of the head trauma suffered during his playing career BRUCE ANDERSON suffers from symptoms associated with multiple traumatic brain injury and CTE.

32.    BRUCE ANDERSON is also at heightened risk of developing further adverse neurological symptoms in the future.

33.    As discussed in greater detail below, the NFL consistently denied any relationship between symptoms of CTE, or other neurodegenerative disorders, and repeated concussions or sub-concussive blows suffered while playing NFL football.  These denials and active refutation on the part of NFL agents, constituted fraud (unintentional or intentional) and concealment of information directly related to BRUCE ANDERSON's causes of action.

34.    Because of the continuing tort of concealment and fraud carried out by the Defendant, it was not until 2013, that BRUCE ANDERSON had any reason to consider that

repeated head impacts suffered during his career were the cause of his present symptoms and that his symptoms were caused by conduct, misconduct and omissions of the Defendant.

### WALTER AND MARY LANDERS

35.     Plaintiffs WALTER LANDERS and his wife MARY LANDERS are citizens and residents of Georgia.

36.     Plaintiff WALTER LANDERS played in the NFL as a running back for the Green Bay Packers during the 1978 and 1979 seasons.

37.     Throughout his career as a professional football player WALTER LANDERS suffered repeated hits and blows to the head.

38.     As a result of the head trauma suffered during his playing career WALTER LANDERS suffers from symptoms associated with multiple traumatic brain injury and CTE.

39.     WALTER LANDERS is also at heightened risk of developing further adverse neurological symptoms in the future.

40.     As discussed in greater detail below, the NFL consistently denied any relationship between symptoms of CTE, or other neurodegenerative disorders, and repeated concussions or sub-concussive blows suffered while playing NFL football.  These denials and active refutation on the part of NFL agents, constituted fraud (unintentional or intentional) and concealment of information directly related to WALTER LANDERS or MARY LANDERS' causes of action.

41.     Because of the continuing tort of concealment and fraud carried out by the Defendant, it was not until 2013, that WALTER LANDERS or MARY LANDERS had any reason to consider that repeated head impacts suffered during his career were the cause of WALTER LANDERS' present symptoms and that his symptoms were caused by conduct, misconduct and omissions of the Defendant.

**RAY PINION AND LYNELL PINION**

42.     Plaintiffs RAY PINION and his wife LYNELL PINION are citizens and residents of Texas.

43.     Plaintiff RAY PINION played in the AFL as an offensive lineman for the Houston Oilers during the 1962 season and the Denver Broncos during the 1963 preseason.

44.     Throughout his career as a professional football player RAY PINION suffered repeated hits and blows to the head.

45.     As a result of the head trauma suffered during his playing career RAY PINION suffers from Alzheimer's disease and other symptoms associated with multiple traumatic brain injury and CTE.

46.     RAY PINION is also at heightened risk of developing further adverse neurological symptoms in the future.

47.     As discussed in greater detail below, the NFL consistently denied any relationship between symptoms of CTE, or other neurodegenerative disorders, and repeated concussions or sub-concussive blows suffered while playing NFL football.  These denials and active refutation on the part of NFL agents, constituted fraud (unintentional or intentional) and concealment of information directly related to RAY PINION or LYNELL PINION's causes of action.

48.     Because of the continuing tort of concealment and fraud carried out by the Defendant, it was not until 2013, that RAY PINION or LYNELL PINION had any reason to consider that repeated head impacts suffered during his career were the cause of RAY PINION's present symptoms and that his symptoms were caused by conduct, misconduct and omissions of the Defendant.

**GEORGE ST. JAMES FORMERLY KNOWN AS GEORGE SHORTHOSE**

49.     Plaintiff GEORGE ST. JAMES is a citizen and resident of Colorado.

50.     Plaintiff GEORGE ST. JAMES played in the NFL under his former name GEORGE SHORTHOSE as a wide receiver for the Kansas City Chiefs during the 1985 season.

51.     Throughout his career as a professional football player GEORGE ST. JAMES f/k/a GEORGE SHORTHOSE suffered repeated hits and blows to the head.

52.     As a result of the head trauma suffered during his playing career GEORGE ST. JAMES f/k/a GEORGE SHORTHOSE suffers from symptoms associated with multiple traumatic brain injury and CTE.

53.     GEORGE ST. JAMES f/k/a GEORGE SHORTHOSE is also at heightened risk of developing further adverse neurological symptoms in the future.

54.     As discussed in greater detail below, the NFL consistently denied any relationship between symptoms of CTE, or other neurodegenerative disorders, and repeated concussions or sub-concussive blows suffered while playing NFL football.  These denials and active refutation on the part of NFL agents, constituted fraud (unintentional or intentional) and concealment of information directly related to GEORGE ST. JAMES f/k/a GEORGE SHORTHOSE's causes of action.

55.     Because of the continuing tort of concealment and fraud carried out by the Defendant, it was not until 2013, that GEORGE ST. JAMES f/k/a GEORGE SHORTHOSE had any reason to consider that repeated head impacts suffered during his career were the cause of his present symptoms and that his symptoms were caused by conduct, misconduct and omissions of the Defendant.

### GEORGE DANIEL LANPHEAR AND ALICE SHEA

56.     Plaintiffs GEORGE DANIEL LANPHEAR and his wife ALICE SHEA are citizens and residents of Illinois.

57.     Plaintiff GEORGE DANIEL LANPHEAR played in the AFL as a defensive end for the Houston Oilers during the 1960 and 1962 seasons.

58.     Throughout his career as a professional football player GEORGE DANIEL LANPHEAR suffered repeated hits and blows to the head.

59.     As a result of the head trauma suffered during his playing career GEORGE DANIEL LANPHEAR suffers from Alzheimer's disease and other symptoms associated with multiple traumatic brain injury and CTE.

60.     GEORGE DANIEL LANPHEAR is also at heightened risk of developing further adverse neurological symptoms in the future.

61.     As discussed in greater detail below, the NFL consistently denied any relationship between symptoms of CTE, or other neurodegenerative disorders, and repeated concussions or sub-concussive blows suffered while playing NFL football.  These denials and active refutation on the part of NFL agents, constituted fraud (unintentional or intentional) and concealment of information directly related to GEORGE DANIEL LANPHEAR or ALICE SHEA's causes of action.

62.     Because of the continuing tort of concealment and fraud carried out by the Defendant, it was not until 2013, that GEORGE DANIEL LANPHEAR or ALICE SHEA had any reason to consider that repeated head impacts suffered during his career were the cause of GEORGE DANIEL LANPHEAR's present symptoms and that his symptoms were caused by conduct, misconduct and omissions of the Defendant.

### EDWARD MODZELEWSKI AND JOANNE MODZELEWSKI

63.     Plaintiffs EDWARD MODZELEWSKI and his wife JOANNE MODZELEWSKI

are citizens and residents of Arizona.

64.     Plaintiff EDWARD MODZELEWSKI played in the NFL as a fullback during the

1952 through 1959 seasons.  During the 1952 season EDWARD MODZELEWSKI played for

the Pittsburgh Steelers, and during the 1955 through 1959 seasons he played for the Cleveland

Browns.

65.     Throughout his career as a professional football player EDWARD

MODZELEWSKI suffered repeated hits and blows to the head.

66.     As a result of the head trauma suffered during his playing career EDWARD

MODZELEWSKI suffers from symptoms associated with multiple traumatic brain injury and

CTE.

67.     EDWARD MODZELEWSKI is also at heightened risk of developing further

adverse neurological symptoms in the future.

68.     As discussed in greater detail below, the NFL consistently denied any relationship

between symptoms of CTE, or other neurodegenerative disorders, and repeated concussions or

sub-concussive blows suffered while playing NFL football.  These denials and active refutation

on the part of NFL agents, constituted fraud (unintentional or intentional) and concealment of

information directly related to EDWARD MODZELEWSKI or JOANNE MODZELEWSKI's

causes of action.

69.     Because of the continuing tort of concealment and fraud carried out by the

Defendant, it was not until 2013, that EDWARD MODZELEWSKI or JOANNE

MODZELEWSKI had any reason to consider that repeated head impacts suffered during his

career were the cause of EDWARD MODZELEWSKI's present symptoms and that his symptoms were caused by conduct, misconduct and omissions of the Defendant.

### ANTHONY HENTON AND KIMBERLY HENTON

70.     Plaintiffs ANTHONY HENTON and his wife KIMBERLY HENTON are citizens and residents of Alabama.

71.     Plaintiff ANTHONY HENTON played in the NFL as a linebacker during the 1986 through 1989 seasons.  During the 1986 and 1988 seasons ANTHONY HENTON played for the Pittsburgh Steelers, and during the 1987 he was on the Steelers practice squad.  During the 1989 preseason ANTHONY HENTON played for the Seattle Seahawks.

72.     Throughout his career as a professional football player ANTHONY HENTON suffered repeated hits and blows to the head.

73.     As a result of the head trauma suffered during his playing career ANTHONY HENTON suffers from symptoms associated with multiple traumatic brain injury and CTE.

74.     ANTHONY HENTON is also at heightened risk of developing further adverse neurological symptoms in the future.

75.     As discussed in greater detail below, the NFL consistently denied any relationship between symptoms of CTE, or other neurodegenerative disorders, and repeated concussions or sub-concussive blows suffered while playing NFL football.  These denials and active refutation on the part of NFL agents, constituted fraud (unintentional or intentional) and concealment of information directly related to ANTHONY HENTON or KIMBERLY HENTON's causes of action.

76.     Because of the continuing tort of concealment and fraud carried out by the Defendant, it was not until 2013, that ANTHONY HENTON or KIMBERLY HENTON had any

reason to consider that repeated head impacts suffered during his career were the cause of ANTHONY HENTON's present symptoms and that his symptoms were caused by conduct, misconduct and omissions of the Defendant.

## MARVIN HARVEY

77.     Plaintiff MARVIN HARVEY is a citizen and resident of Florida.

78.     Plaintiff MARVIN HARVEY played in the NFL as a tight end during the 1981 through 1983 seasons, as well as the 1986 preseason.  During the 1981 season MARVIN HARVEY played with the Kansas City Chiefs.  During the 1982 season he played in the preseason with the Kansas City Chiefs and then played on the practice squad for the Los Angeles Raiders.  Finally, during 1986 MARVIN HARVEY played with the Atlanta Falcons during training camp.

79.     Throughout his career as a professional football player MARVIN HARVEY suffered repeated hits and blows to the head.

80.     As a result of the head trauma suffered during his playing career MARVIN HARVEY suffers from symptoms associated with multiple traumatic brain injury and CTE.

81.     MARVIN HARVEY is also at heightened risk of developing further adverse neurological symptoms in the future.

82.     As discussed in greater detail below, the NFL consistently denied any relationship between symptoms of CTE, or other neurodegenerative disorders, and repeated concussions or sub-concussive blows suffered while playing NFL football.  These denials and active refutation on the part of NFL agents, constituted fraud (unintentional or intentional) and concealment of information directly related to MARVIN HARVEY's causes of action.

13

83.     Because of the continuing tort of concealment and fraud carried out by the Defendant, it was not until 2013, that MARVIN HARVEY had any reason to consider that repeated head impacts suffered during his career were the cause of his present symptoms and that his symptoms were caused by conduct, misconduct and omissions of the Defendant.

### JAMES PHILLIPS

84.     Plaintiff JAMES PHILLIPS is a citizen and resident of Alabama.

85.     Plaintiff JAMES PHILLIPS played in the NFL as a wide receiver during the 1958 through 1967 seasons.  During the 1958 through 1964 seasons JAMES PHILLIPS played with the Los Angeles Rams, and during the 1965 through 1967 seasons he played with the Minnesota Vikings.

86.     Throughout his career as a professional football player JAMES PHILLIPS suffered repeated hits and blows to the head.

87.     As a result of the head trauma suffered during his playing career JAMES PHILLIPS suffers from symptoms associated with multiple traumatic brain injury and CTE.

88.     JAMES PHILLIPS is also at heightened risk of developing further adverse neurological symptoms in the future.

89.     As discussed in greater detail below, the NFL consistently denied any relationship between symptoms of CTE, or other neurodegenerative disorders, and repeated concussions or sub-concussive blows suffered while playing NFL football.  These denials and active refutation on the part of NFL agents, constituted fraud (unintentional or intentional) and concealment of information directly related to JAMES PHILLIPS' causes of action.

90.     Because of the continuing tort of concealment and fraud carried out by the Defendant, it was not until 2013, that JAMES PHILLIPS had any reason to consider that

repeated head impacts suffered during his career were the cause of his present symptoms and that his symptoms were caused by conduct, misconduct and omissions of the Defendant.

**DALE DAWSON**

91.     Plaintiff DALE DAWSON is a citizen and resident of Florida.

92.     Plaintiff DALE DAWSON played in the NFL as a place kicker during the 1987 through 1988 seasons.  During the 1987 season DALE DAWSON played with the Minnesota Vikings, and during the 1988 season he played with the Green Bay Packers and Philadelphia Eagles.

93.     Throughout his career as a professional football player DALE DAWSON suffered repeated hits and blows to the head.

94.     As a result of the head trauma suffered during his playing career DALE DAWSON suffers from symptoms associated with multiple traumatic brain injury and CTE.

95.     DALE DAWSON is also at heightened risk of developing further adverse neurological symptoms in the future.

96.     As discussed in greater detail below, the NFL consistently denied any relationship between symptoms of CTE, or other neurodegenerative disorders, and repeated concussions or sub-concussive blows suffered while playing NFL football.  These denials and active refutation on the part of NFL agents, constituted fraud (unintentional or intentional) and concealment of information directly related to DALE DAWSON's causes of action.

97.     Because of the continuing tort of concealment and fraud carried out by the Defendant, it was not until 2013, that DALE DAWSON had any reason to consider that repeated head impacts suffered during his career were the cause of his present symptoms and that his symptoms were caused by conduct, misconduct and omissions of the Defendant.

## PAUL BRADFORD AND MARGARITA BRADFORD

98.     Plaintiffs PAUL BRADFORD and his wife MARGARITA BRADFORD are citizens and residents of California.

99.     Plaintiff PAUL BRADFORD played in the NFL a defensive back for the San Diego Chargers during the 1997 and 1998 seasons.

100.    Throughout his career as a professional football player PAUL BRADFORD suffered repeated hits and blows to the head.

101.    As a result of the head trauma suffered during his playing career PAUL BRADFORD symptoms associated with multiple traumatic brain injury and CTE.

102.    PAUL BRADFORD is also at heightened risk of developing further adverse neurological symptoms in the future.

103.    As discussed in greater detail below, the NFL consistently denied any relationship between symptoms of CTE, or other neurodegenerative disorders, and repeated concussions or sub-concussive blows suffered while playing NFL football.  These denials and active refutation on the part of NFL agents, constituted fraud (unintentional or intentional) and concealment of information directly related to PAUL BRADFORD or MARGARITA BRADFORD's causes of action.

104.    Because of the continuing tort of concealment and fraud carried out by the Defendant, it was not until 2013, that PAUL BRADFORD or MARGARITA BRADFORD had any reason to consider that repeated head impacts suffered during his career were the cause of PAUL BRADFORD's present symptoms and that his symptoms were caused by conduct, misconduct and omissions of the Defendant.

### NATHANIEL JAMES

105.    Plaintiff NATHANIEL JAMES is a citizen and resident of Florida.

106.    Plaintiff NATHANIEL JAMES played in the NFL as a defensive back during the 1968 season and the 1971 preseason.  During the 1968 season NATHANIEL JAMES played for the Cleveland Browns, and during the 1971 preseason he played for the New Orleans Saints.

107.    Throughout his career as a professional football player NATHANIEL JAMES suffered repeated hits and blows to the head.

108.    As a result of the head trauma suffered during his playing career NATHANIEL JAMES suffers from symptoms associated with multiple traumatic brain injury and CTE.

109.    NATHANIEL JAMES is also at heightened risk of developing further adverse neurological symptoms in the future.

110.    As discussed in greater detail below, the NFL consistently denied any relationship between symptoms of CTE, or other neurodegenerative disorders, and repeated concussions or sub-concussive blows suffered while playing NFL football.  These denials and active refutation on the part of NFL agents, constituted fraud (unintentional or intentional) and concealment of information directly related to NATHANIEL JAMES' causes of action.

111.    Because of the continuing tort of concealment and fraud carried out by the Defendant, it was not until 2013, that NATHANIEL JAMES had any reason to consider that repeated head impacts suffered during his career were the cause of his present symptoms and that his symptoms were caused by conduct, misconduct and omissions of the Defendant.

### JAMES KALAFAT AND TONYA KALAFAT

112.    Plaintiffs JAMES KALAFAT and his wife TONYA KALAFAT are citizens and residents of California.

113.    Plaintiff JAMES KALAFAT played in the NFL as a linebacker during the 1984 preseason and 1987 season.  During the 1984 preseason JAMES KALAFAT played with the Kansas City Chiefs, and during 1987 he played for the Los Angeles Rams.

114.    Throughout his career as a professional football player JAMES KALAFAT suffered repeated hits and blows to the head.

115.    As a result of the head trauma suffered during his playing career JAMES KALAFAT suffers from symptoms associated with multiple traumatic brain injury and CTE.

116.    JAMES KALAFAT is also at heightened risk of developing further adverse neurological symptoms in the future.

117.    As discussed in greater detail below, the NFL consistently denied any relationship between symptoms of CTE, or other neurodegenerative disorders, and repeated concussions or sub-concussive blows suffered while playing NFL football.  These denials and active refutation on the part of NFL agents, constituted fraud (unintentional or intentional) and concealment of information directly related to JAMES KALAFAT or TONYA KALAFAT's causes of action.

118.    Because of the continuing tort of concealment and fraud carried out by the Defendant, it was not until 2013, that JAMES KALAFAT or TONYA KALAFAT had any reason to consider that repeated head impacts suffered during his career were the cause of JAMES KALAFAT's present symptoms and that his symptoms were caused by conduct, misconduct and omissions of the Defendant.

### CLEO SIMMONS AND GWEN SIMMONS

119.    Plaintiffs CLEO SIMMONS and his wife GWEN SIMMONS are citizens and residents of Texas.

120.    Plaintiff CLEO SIMMONS played in the NFL as a Tight End during the 1983 season, as well as the 1984 and 1985 preseasons.  During the 1983 season and 1984 preseason CLEO SIMMONS played for the Dallas Cowboys, and during the 1985 preseason he played with the Indianapolis Colts.

121.    Throughout his career as a professional football player CLEO SIMMONS suffered repeated hits and blows to the head.

122.    As a result of the head trauma suffered during his playing career CLEO SIMMONS suffers from symptoms associated with multiple traumatic brain injury and CTE.

123.    CLEO SIMMONS is also at heightened risk of developing further adverse neurological symptoms in the future.

124.    As discussed in greater detail below, the NFL consistently denied any relationship between symptoms of CTE, or other neurodegenerative disorders, and repeated concussions or sub-concussive blows suffered while playing NFL football.  These denials and active refutation on the part of NFL agents, constituted fraud (unintentional or intentional) and concealment of information directly related to CLEO SIMMONS or GWEN SIMMONS' causes of action.

125.    Because of the continuing tort of concealment and fraud carried out by the Defendant, it was not until 2013, that CLEO SIMMONS or GWEN SIMMONS had any reason to consider that repeated head impacts suffered during his career were the cause of CLEO SIMMONS' present symptoms and that his symptoms were caused by conduct, misconduct and omissions of the Defendant.

### DEFENDANT NATIONAL FOOTBALL LEAGUE

126.    Defendant NFL is a nonprofit, unincorporated entity, with its principal place of business located at 280 Park Avenue, 15th Floor, New York, NY 10017, presently conducting

business activities in Philadelphia County and receiving substantial revenues from its business activities in Philadelphia County.

127.    At all relevant times, the NFL, which is also the successor of the American Football League ("AFL") with which it merged in 1970, was a trade association of franchise owners, currently numbering thirty-two (32), within two conferences, the AFC and the NFC ("NFL" or "Defendant").

128.    The NFL is a separate entity from each of its teams.

129.    Each team functions as a separate business but operates under shared revenue generated through broadcasting, merchandising and licensing.

130.    The NFL is not, and has never been, the employer of Plaintiffs who, as players, were employed directly by independent franchise teams during his career in professional football.

131.    The NFL governs and promotes the game of American football, sets and enforces rules and league policies, and regulates team ownership and revenue-sharing. It generates revenue mostly through marketing sponsorships, licensing merchandise and by selling national broadcasting rights to the games. The teams share a percentage of the League's overall revenue.

132.    Owing in part to its immense financial power and status in American football, the NFL has assumed enormous influence over the research and education of physicians, trainers, coaches, and amateur football players at all levels of the game regarding football injuries.

## MASS ACTION AND JOINDER ALLEGATIONS

133.    Joinder is permissible pursuant to Fed. R. Civ. P. 20(a) in that the claims alleged herein arise out of the same series of occurrences, and questions of law or fact common to all Plaintiffs arise in this action.

134.    Common questions of law and fact will arise in this action, including but not limited to:

        a.    Whether the NFL, through its own voluntary undertaking, was negligent in its response to the health effects of repeated head impacts and the injuries consequently suffered by the Plaintiffs;

        b.    Whether the NFL committed negligence and/or fraud in misrepresenting the risks of repeated head impacts in NFL play to the Plaintiffs; and

        c.    Whether repeated head impacts during play in the NFL cause latent neurodegenerative brain disorders and disease.

135.    As a result of the foregoing, a joint action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## GENERAL ALLEGATIONS

### THE NFL HAS PROMOTED AND MYTHOLOGIZED THE VIOLENT NATURE OF PROFESSIONAL FOOTBALL

136.    The NFL focuses on violence as one of the League's greatest selling points, portraying the league's players as gladiators.  To advance the NFL's purpose, its propaganda arm, NFL Films, has created numerous highlight features that focus solely on the hardest-hits that take place on the football field.  These featured videos are marketed and sold to advance the NFL's culture of violence as entertainment.

137.    The list of videos created by NFL Films glorifying violent plays includes, but is not limited to, the following titles: *NFL: Moment of Impact* (2007); *NFL's 100 Greatest Tackles* (1995); *Big Blocks and King Size Hits* (1990); *The Best of Thunder and Destruction – NFL's Hardest Hits*; *NFL Films Video: Strike Force* (1989); *The NFL's Greatest Hits* (1989); *Crunch*

*Course*; *Crunch Course II* (1988); *Crunch Masters*; *In the Crunch* (1987); *NFL Rocks*; and *NFL Rocks: Extreme Football*.

138.    NFL Films also created TV series shown on NFL Network, entitled the "*Top Ten Most Feared Tacklers*", which now features its own section on the NFL's website.  The episodes of this program are comprised of videos highlighting the most vicious tacklers the NFL has ever seen.

139.    The NFL, through NFL Films, also promotes a culture in which playing hurt or with an injury is both expected and acclaimed of players.  The NFL has produced videos that praise players who embody the ethos of playing hurt (for example, "*Top Ten Gutsiest Performances*").  This film and others like it celebrate players' ability to play through the pain and injury and promote an expectation among players and fans that players must and often do play through any injury, including concussions and sub-concussive traumatic brain injuries.

140.    These videos evidence an overall culture in the NFL where players are encouraged to play despite an injury, in part, because failure to play through an injury creates the risk of losing playing time, a starting position, and possibly a career.

141.    Within this culture, the NFL purposefully profits from the violence it  promotes.

### CONCUSSIONS, TRAUMATIC BRAIN INJURY AND CTE

142.    The American Association of Neurological Surgeons ("AANS") defines a concussion as "a clinical syndrome characterized by an immediate and transient alteration in brain function, including an alteration of mental status and level of consciousness, resulting from mechanical force or trauma."  The injury generally occurs when the head either accelerates rapidly and then is stopped, or is spun suddenly. The results frequently include confusion, blurred vision, memory loss, nausea and, sometimes, unconsciousness.

143.   The AANS defines traumatic brain injury ("TBI") as:

a blow or jolt to the head, or a penetrating head injury that disrupts the
normal function of the brain.  TBI can result when the head suddenly and
violently hits an object, or when an object pierces the skull and enters
brain tissue.  Symptoms of a TBI can be mild, moderate or severe,
depending on the extent of damage to the brain.  Mild cases may result in
a brief change in mental state or consciousness, while severe cases may
result in extended periods of unconsciousness, coma or even death.

144.   A concussion or sub-concussive TBI may result in the brain smashing, jiggling
and torquing, causing strains and tears, snapping blood vessels, killing brain cells (neurons) and
shearing the delicate connections (axons) that link this incredibly complex organ.

145.   Medical evidence has shown that symptoms of a concussion can reappear hours or
days after a concussive event, indicating that the injury has not healed.

146.   According to neurologists, once a person suffers a concussion, he is as much four
times more likely to sustain a second concussion. Additionally, after several concussions, a lesser
impact may cause the injury, and the injured player requires more time to recover.

147.   Clinical and neuro-pathological studies by some of the nation's foremost experts
demonstrate that multiple concussions and/or repeated sub-concussive TBIs sustained during an
NFL player's career may cause severe cognitive problems such as depression early-onset
Alzheimer's Disease, dementia, deficits in cognitive functioning, reduced processing speed,
attention, and reasoning, loss of memory, sleeplessness, mood swings, personality changes, and
the debilitating and latent disease known as Chronic Traumatic Encephalopathy.

148.   Chronic Traumatic Encephalopathy ("CTE") is, a progressive degenerative
disease of the brain found in athletes (and others) with a history of multiple concussions and/or
repeated sub-concussive TBIs. Conclusive studies have shown this condition to be prevalent in
retired professional football players who have a history of head trauma.

23

149.    Multiple concussions and/or repeated sub-concussive TBIs, trigger latent, progressive degeneration of brain tissue. These changes in the brain can begin months, years, or even decades after the last concussion or end of active athletic involvement.

150.    To date, neuro-anatomists have performed autopsies on greater than 25 former NFL players who died after exhibiting signs of degenerative brain disease. At least 90 % of these players were found to have suffered from CTE.

151.    Published scientific research has shown that 36% of NFL retirees studied, age 65-75, suffered from dementia, while only 2.2-6.5% of the same age group in the general population suffered from dementia.

**THE NFL OWED A DUTY TO ITS PLAYERS**

152.    At all times, the NFL was and is in a position of superior knowledge as compared with Plaintiffs with respect to the risks associated with multiple concussions and repeated sub-concussive TBIs.

153.    At all times, the NFL's possessed vastly superior knowledge than that available to players regarding head injuries in professional football, and the associated health risks.

154.    Since its inception, the NFL unilaterally placed itself in the role of protecting players, informing players of safety concerns, and imposing unilaterally a wide variety of rules to protect players from injuries that were costly to the player, the game, and profits.  From the beginning, the NFL portrayed itself to players and the public at large as the guardian of the players' best interests on health and safety issues.

155.    As a result, players and their families relied on the NFL to intervene in matters of player safety, to recognize issues of player safety, and to be truthful on the issue of player safety.

24

156.    Recently, the NFL admitted that "[s]ince its earliest days, the league has continuously taken steps to ensure that the game is played as fairly as possible without unnecessary risk to its participants, including making changes and enhancements to game safety rules." (www.nflhealthsasfety.com/commitment/regulations) (2011-2012).

157.    Over many decades, the NFL has known the risks of concussive and sub-concussive injury in football.  On information and belief, the NFL has paid medical science consultants to advise it regarding health risks associated with playing football, including the health risks associated with repetitive concussive and sub-concussive injuries.

158.    Such ongoing medical advice and information gave the NFL continuing superior knowledge to the players.  When taken with the NFL's unilateral power to set rules and determine policies throughout its game, the NFL was at all relevant times situated to direct and control how the game would be played and to determine the risks to which players would be exposed.

159.    As a result, the NFL unilaterally assumed a duty to act in the best interests of the health and safety of NFL players, to provide truthful information to NFL players regarding risks to their health, and to take all reasonable steps necessary to ensure the safety of players.

160.    As early as the 1920s, the NFL assumed the common law duty to ensure the safety of players participating in professional football and to inform the players of safety information that they needed to know.

161.    Over the history of the league, the NFL has instituted the following rule changes in carrying out its legal duties including, but not limited to:

    a.      In 1929, adding a field judge;

    b.      In 1933, establishing hash-marks at 10 yards from the sidelines;

c.      In 1938, enacting a rule making unnecessary roughness, a deliberate rough contact on the passer after the pass is made, a penalty;

d.      In 1943, making helmets mandatory;

e.      In 1947, adding a back field judge;

f.      In 1955, enacting a rule that the ball is dead when a runner touches the ground with any part of his body except his hands while in the grasp of an opponent (1955);

g.      In 1956, enacting a rule that the ball is dead immediately if the runner touches the ground with any part of his body except his hands after being contacted by a defensive player;

h.      In 1956, enacting a rule prohibiting the grabbing of any player's facemask, other than the ball carrier;

i.      In 1966, enacting a rule prohibiting players from grabbing any player's facemask;

j.      In 1966, requiring that goal posts be offset from the goal line (1966);

k.      In 1967, enacting a rule prohibiting a player who signals for a fair catch from blocking or initiating contact with one of the kicking team's players until the ball touches a player;

l.      In 1973, enacting a rule prohibiting a defensive player who jumps or stands on a teammate, or who is picked up by a teammate, from attempting to block an opponent's kick;

m.      In 1974, enacting a rule preventing any receiver from being blocked below the waist after moving beyond the line of scrimmage;

n.      In 1974, enacting a rule preventing eligible receivers who take a position more than two yards from the tackle from being blocked below the waist;

o.      In 1976, enacting a rule prohibiting a defender from running or diving into a ball carrier who has fallen to the ground untouched;

p.      In 1977, enacting a rule prohibiting a defensive lineman from striking an opponent above the shoulders during his initial charge (previously the NFL made this illegal only during the first step);

q.      In 1977, enacting a rule prohibiting a wide receiver from clipping an opponent anywhere;

r.      In 1979, enacting rules regarding mandatory equipment;

26

s.     In 1979, enacting a rule prohibiting a player in the backfield from chopping an outside rusher on a pass play;

t.     In 1979, enacting a rule prohibiting players from throwing a punch or forearm or kicking an opponent; and

u.     In 1980, enacting a rule prohibiting players from striking, swinging, or clubbing an opponent in the head, neck or face.

162.   As the sport's sole governing entity, the NFL has made it known to players and teams alike that the NFL actively and pervasively governs player conduct and health and safety both on and off the field.  In public statements since its inception, the NFL has stated that its goals include taking necessary steps for the safety, health and well-being of players and their families.

163.   The NFL's paternalistic approach included comprehensive rookie training programs to teach new players how to manage their personal lives, inquiries from the media, and newly acquired income.

164.   For decades, the NFL voluntarily instituted programs to support player health and safety on and off the field, and the players and their families looked to the NFL for guidance on these issues.

165.   For instance, the NFL unilaterally established medical, life insurance, and retirement plans, funded the plans, and controlled the nature and extent of each of these plans without input or involvement of from any player.

166.   Despite its unilateral duty and power to govern player conduct on and off the field, the NFL has for decades ignored, turned a blind eye to, and actively concealed the risks to players of repetitive sub-concussive and concussive head impacts, which can and do result in players being knocked unconscious or having "their bell rung" so that they are in a conscious but disoriented state.

167.    Thus, since its inception, and continuing into the present, the NFL has been in a position that affords it a special relationship to NFL players as the guardian of their health and safety.  For that reason, from its inception and continuing into the present, the NFL owed a duty of reasonable care to keep NFL players informed of neurological risks, to inform NFL players truthfully, and not to mislead NFL players about the risks of permanent neurological damage that can occur from multiple concussions and/or repeated sub-concussive TBIs incurred while playing football.

168.    During the decades of the 1930s through the 1960s, the NFL – in its supervisory role as guardian of player safety -- identified  tackling techniques, as listed among the examples in ¶161 above that  exposed players to increased risks of injury, including head, neck, and leg injuries.  The NFL issued regulations which served as daily warnings to players of the hazardous nature of continuing to follow hazardous tackling techniques.

169.    As a result of its position of authority and repository of a composite of information throughout the League, the NFL was aware of how to protect NFL players from dangerous circumstances on the field of play and took unilateral, but insufficient, measures to do so.

170.    On information and belief, over decades, the NFL, its agents, and its paid consultants voluntarily and gratuitously consulted with independent physicians and neuro-cognitive specialists on the issue of head trauma to NFL players.  The NFL then ignored and suppressed professional advice on such diverse and important topics as: the recognition of the circumstances that can precipitate concussions and sub-concussive TBI, the long-term potential consequences of concussions and sub-concussive TBI to NFL players, and solutions for  players who have sustained concussions and sub-concussive TBI.

28

171.    At all relevant times, the NFL gratuitously assumed a duty to research, study, test, understand and address the risks of neurological injury—short term and long term—related to playing football in the NFL.  As such, the NFL owed a duty of reasonable care to educate players about the risks associated with multiple concussions and/or repetitive sub-concussive TBIs, of which the NFL was aware and had been aware for many years.  By gratuitously undertaking to study and publicly report about concussions and sub-concussive TBIs in professional football, the NFL assumed a duty not to mislead players and the general public about the risks of permanent neurological damage that can occur from head trauma incurred while playing football.

172.    Moreover, the NFL gratuitously assumed a duty to the current and retired players to provide truthful information about the risks of concussive and sub-concussive injuries in light of the fact that, at all relevant times, the NFL knew that the vast majority of NFL players played under non-guaranteed contracts and, as such, would willingly (and unknowingly) expose themselves to additional neurological injury and an increased risk of harm solely to maintain their income under such contracts.

173.    Once the NFL assumed a duty to reasonably study and understand the long-term cognitive consequences of exposure to multiple concussions and/or repeated sub-concussive TBIs, it failed to act appropriately by covering-up, hiding, denying, and suppressing all pertinent information.  Instead of using this information for the safety of the players, the NFL fraudulently covered up its knowledge of the dangers.

### RESEARCH REGARDING CONCUSSIONS AND HEAD TRAUMA IN FOOTBALL

174.    For well over 60 years, the NFL has known or should have known of the rate and seriousness of concussions and sub-concussive TBIs in the sport of football.

175.    In a landmark 1928 study, pathologist Harrison Martland described the clinical spectrum of abnormalities found in "almost 50 percent of fighters [boxers] . . . if they ke[pt] at the game long enough" (the "Martland study").  The article was published in the *Journal of the American Medical Association*.  This study was the first to link sub-concussive blows and "mild concussions" to neurodegenerative disease.

176.    In a 1937 report, the American Football Coaches Association warned that players who suffered a concussion should be removed from sports demanding personal contact.

177.    In 1948, the New York State Legislature created the Medical Advisory Board of the New York Athletic Commission for the specific purpose of creating mandatory rules for professional boxing designed to prevent or minimize the health risks to boxers. After a three year study, the Medical Advisory Board recommended, among other things, (a) an accident survey committee to study ongoing accidents and deaths in boxing rings; (b) two physicians at ring-side for every bout; (c)  post-bout medical follow-up exams; (d) a 30-day period of no activity following a knockout and a medical follow up for the boxer, all of which was designed to avoid the development of "punch drunk syndrome," also known at the time as "traumatic encephalopathy"; (e) a physician's prerogative to recommend that a boxer surrender temporarily his boxing license if the physician notes that boxer suffers significant injury or knockout; and (f) a medical investigation of boxers who suffer knockouts numerous times.

178.    The New York State Athletic Commission codified the recommendations of its Medical Advisory Board as rules governing all boxing matches.

179.    A 1952 article published in the *New England Journal of Medicine* recommended a three-strike rule for concussions in football (i.e., recommending that players cease to play football after receiving their third concussion.)

180.     A 1967 study examined changes in brain activity caused by impacts from football by utilizing EEG to read brain activity in game conditions, including after head trauma.  Drs. Hughes & Hendrix, "Telemetered EEG from a Football Player in Action," *Electroencephalography & Clinical Neurophysiology* 24:183-86.

181.     In 1969, a paper published in the *Journal of Medicine and Science in Sports* by a leading medical expert in the treatment of head injuries recommended that any concussive event with transitory loss of consciousness requires the removal of the football player from play and requires monitoring.  This paper was also the basis for a 1973 book by the same experts, entitled *Head and Neck Injuries in Football*.

182.     A 1975 study by Drs. Gronwall & Wrightson looked at the cumulative effects of concussive injuries in non-athletes and found that those who suffered two concussions took longer to recover than those who suffered from a single concussion. The authors noted that these results could be extrapolated to athletes given the common occurrence of concussions in sports.

183.     NFL rule-makers knew or should have known that, by the 1960s and 1970s, sports medicine professionals were documenting that the advent and use of the helmet-face mask combination was contributing to the use of the helmeted-head as an offensive weapon, which in turn was increasing the rate of head and neck injuries in football.

184.     Between 1952 and 1994, numerous additional studies were published in medical journals including the *Journal of the American Medical Association*, *Neurology*, the *New England Journal of Medicine*, and *Lancet* warning of the dangers of single concussions, multiple concussions, and/or football-related head trauma.  These studies collectively established that:

        a.      repetitive head trauma in contact sports, including boxing and football, has potential dangerous long-term effects on brain function;

b.     acceleration and rapid deceleration of the head that results in brief loss of consciousness in primates also results in a tearing of the axons (brain cells) within the brainstem;

c.     with respect to mild head injury in athletes who play contact sports, there is a relationship between neurologic pathology and length of the athlete's career;

d.     immediate retrograde memory issues occur following concussions;

e.     mild head injury requires recovery time without risk of subjection to further injury;

f.     head trauma is linked to dementia;

g.     a football player who suffers a concussion requires significant rest before being subjected to further contact; and,

h.     minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials and reduced speed of information processing.

185.     By 1991, three distinct medical professionals/entities, all independent from the NFL—Dr. Robert Cantu of the American College of Sports Medicine, the American Academy of Neurology and the Colorado Medical Society—developed return-to-play criteria for football players suspected of having sustained head injuries, but the NFL failed to adopt any of the three sets of criteria.

186.     In 1999, former Pittsburgh Steeler and Hall of Famer Mike Webster filed with the NFL a request that he receive complete disability benefits based on the fact that he had sustained repeated and disabling head impacts while a player for the Steelers.  In support of his claim, Webster submitted extensive medical reports and testimony that stated, among other things, that Webster suffered from "traumatic or punch drunk encephalopathy" sustained from playing football that left him totally and permanently disabled as of 1991.

187.    The NFL's own physician independently examined Webster and concluded that Webster was mentally "completely and totally disabled as of the date of his retirement and was certainly disabled when he stopped playing football sometime in 1990."

188.    Thus, the NFL, knew and accepted that repeated TBIs led to long-term encephalopathy and permanent mental disability.

189.    In 2000, Dr. Barry Jordan and Dr. Julian Bailes presented a study at the American Academy of Neurology's 52nd Annual Meeting that surveyed 1,094 former NFL players between the ages of 27 and 86.  The study concluded that: (a) more than 60% had suffered at least one concussion in their careers with 26% of the players having three or more and 15% having five or more; (b) 51% had been knocked unconscious more than once; (c) 73% of those injured said they were not required to sit on the sidelines after their head trauma; (d) 49% of the former players had numbness or tingling; (e) 28% had neck or cervical spine arthritis; (f) 31% had difficulty with memory; (g) 16% were unable to dress themselves; (h) 11% were unable to feed themselves; and (i) eight suffered from Alzheimer's disease.

190.    A 2003 study partially authored by Dr. Kevin Guskiewicz analyzed data from almost 2,500 retired NFL players and found that 263 of the retired players suffered from depression.  The study found that having three or four concussions meant twice the risk of depression as never-concussed players and five or more concussions meant a nearly threefold risk.

191.    In 2004, a convention of neurological experts in Prague met with the aim of providing recommendations for the improvement of safety and health of athletes who suffer concussive injuries in ice hockey, rugby, football, and other sports based on the most up-to-date

research.  These experts recommended that a player never be returned to play while symptomatic, and coined the phrase, "when in doubt, sit them out."

192.    The University of North Carolina's Center for the Study of Retired Athletes published survey-based papers in 2005 through 2007 that found a strong correlation between depression, dementia, and other cognitive impairment in NFL players and the number of concussions those players had received.

193.    Since the 1960s, the Defendant has known or it has had reason to know, from its supervisory and management role, that NFL players suffering repeated concussions were more likely to experience evolving symptoms of post-traumatic brain injury, including headaches, dizziness, loss of memory, and other symptoms associated with neurodegenerative brain disease. Despite this knowledge, until 2010, the Defendant continued to deny any connection or correlation between players suffering concussions and/or sub-concussive TBIs and long-term chronic brain injury or illness.

**MISREPRESENTATIONS AND ATTEMPTS TO CONCEAL
EVIDENCE OF THE RISKS OF REPEATED HEAD TRAUMA**

194.    In 1994, the NFL created the Multiple Traumatic Brain Injury ("MTBI") Committee to research the problem of head injuries in the NFL.  In doing so, the NFL affirmatively assumed a duty to use reasonable care in creating the MTBI Committee, studying concussions on behalf of NFL players, and a duty to use reasonable care in keeping players informed of the risks associated with concussions and sub-concussive TBIs.

195.    The MTBI Committee's stated goal was to present objective findings on the extent to which a concussion problem existed in the NFL, and to outline solutions. The MTBI Committee's studies were purportedly geared toward "improv[ing] player safety" and instituting "rule changes aimed at reducing head injuries."

34

196.    However, since 1994, the NFL's MTBI Committee has negligently and fraudulently pursued its stated goals by engaging in a campaign of disinformation (a) disputing accepted medical science regarding the connection between concussions and repetitive sub-concussive TBIs and neurodegenerative disease; and (b) creating falsified studies that would act as scientific evidence to support the NFL's position.

197.    The MTBI Committee was intended to be independent from the NFL, consisting of a combination of doctors and researchers.

198.    In actuality, however, the MTBI Committee was not independent and consisted of five (5) members already affiliated with the NFL.

199.    In particular, rather than appointing an expert in brain trauma to lead the MTBI, the NFL appointed Dr, Elliot Pellman, a rheumatologist employed by the New York Jets who lacked any specialized training or education relating to concussions, brain injury or neurology.

200.    Dr. Pellman had reportedly been fired by Major League Baseball for lying to Congress regarding his resume.

201.    Despite frequent and harsh outside criticism related to his deficient medical training, background, and experience, Dr. Pellman was permitted to chair the MTBI Committee from 1994 to 2007.

202.    The fact that Dr. Pellman was a paid physician for an NFL Team was an obvious conflict of interest.  At no time was Dr. Pellman independent of the NFL, because he remained a paid employee of an NFL Team on an ongoing basis.

203.    The NFL failed to appoint any neuro-pathologist, neurologist, or any other doctor specializing in brain research to the MTBI Committee.

204.    Beginning in 2003, the NFL's MTBI Committee published a series of articles in medical journals with numerous conclusions at odds with years of existing medical research, including the following:

      a.    that "[b]ecause a significant percentage of players returned to play in the same game [after suffering a concussion] and the overwhelming majority of players with concussions were kept out of football-related activities for less than 1 week, it can be concluded that mild [traumatic brain injuries] in professional football are not serious injuries." See "Concussions in professional football: Summary of the research conducted by the National Football League's Committee on Mild Traumatic Brain Injury." Neurosurg. Focus 21 (4):E12; 2006, Rl. Pellman and D.C. Viano;

      b.    that NFL players did not show a decline in brain function after a concussion;

      c.    that there were no ill effects among those who had three or more concussions or who took hits to the head that sidelined them for a week or more;

      d.    that "no NFL player experienced the second-impact syndrome or cumulative encephalopathy from repeat concussions"; and

      e.    NFL players' brains responded and healed faster than those of high school or college athletes with the same injuries.

205.    The NFL-funded studies are completely devoid of logic and science, and contrary to the NFL's Health and Safety Rules as well as 75 years of published medical literature on concussions and traumatic head injury.

206.    The MTBI Committee's methodology and the conclusions reached in their research were criticized by independent experts due to numerous conclusions at odds with common medical knowledge and basic scientific protocol.

207.    For example, in 2004 the MTBI Committee published a conclusion in which it claimed that the Committee's research found no risk of harm or injury from repeated

concussions in players with previous concussions, and that there was no "7- to 10-day window of increased susceptibility to sustaining another concussion."

208.     In a comment to this publication, one independent doctor wrote that "[t]he article sends a message that it is acceptable to return players while still symptomatic, which *contradicts literature published over the past twenty years* suggesting that athletes be returned to play only after they are asymptomatic, and in some cases for seven days." (emphasis added).

209.     The Committee failed to include hundreds of neuropsychological tests done on players in the results of the Committee's studies on the effects of concussions.

210.     The results reported by Dr. Pellman and the MTBI Committee selectively excluded at least 850 baseline tests.  In a paper published in *Neurosurgery* in December 2004, Dr. Pellman and the other MTBI Committee members reported on the baseline data for 655 players and the results for 95 players who had undergone both baseline testing and post-concussion testing.  They concluded that NFL players did not show a decline in brain function after suffering concussions.  Their further analysis purportedly found no ill effects among those who had three or more concussions or who took hits to the head that kept them out for a week or more.  The paper did not explain where the players in the study groups came from specifically or why certain player data was included and that data from hundreds of other players was not.

211.     In addition, Dr. Pellman fired a neuropsychologist employed by the New York Jets, Dr. William Barr, after Dr. Barr presented the results of an NCAA study, which conflicted with the findings of the MTBI, at a conference.

212.     In contrast to the research conducted by the NFL's MTBI Committee, clinical and neuro-pathological studies performed by independent scientists and physicians demonstrated that

multiple NFL-induced concussions cause cognitive problems such as depression, early on-set dementia and CTE.

213.    In response to these studies, to further the NFL's scheme of fraud and deceit, members of the NFL's MTBI Committee denied knowledge of a link between concussions and cognitive decline.

214.    When the NFL's MTBI Committee anticipated studies that would show causal links between concussions and cognitive degeneration, the Committee promptly published articles producing contrary findings, as part of Defendant's scheme to deceive the players and the public at large.

215.    Dr. Bennet Omalu examined the brain tissue of deceased NFL players, including Mike Webster, Terry Long, Andrew Waters and Justin Strzelczyk.  Dr. Omalu concluded, in an article in *Neurosurgery*, that CTE triggered by multiple NFL concussions was a partial cause of their death.

216.    In response to Dr. Omalu's, article, the NFL's MTBI Committee  wrote a letter to the editor of *Neurosurgery* asking that Dr. Omalu's article be retracted.

217.    In 2007, Dr. Julian Bailes, from West Virginia University, briefed the NFL's MTBI Committee on the findings of Dr. Omalu and other independent studies 1inking multiple NFL head injuries with cognitive decline. Dr. Bailes recalled the MTBI Committee's reaction to his presentation: "the Committee got mad ... we got into it. And I'm thinking, 'This is a ... disease in America's,[sic] most popular sport and how are its leaders responding? Alienate the scientist who found it?  Refuse to accept the science coming from him?"

218.    A clinical study performed by Dr. Kevin Guskiewicz found that retired players who sustained three or more concussions in the NFL had a fivefold prevalence of mild cognitive

impairment.  In response, the NFL's MTBI Committee, promptly attacked the article by refusing to accept a survey of 2,400 former NFL players.

219.     Due to Congressional scrutiny and media pressure, the NFL scheduled a league-wide Concussion Summit for June 2007.  The NFL, in furtherance of its scheme of deceit, issued a pamphlet to players in August 2007, which stated: "Current research with professional athletes has not shown that having more than one or two concussions leads to permanent problems... It is important to understand that there is no magic number for how many concussions is too many."

220.     In 2008, the NFL commissioned a study of over 1,000 former players by the University of Michigan's Institute for Social Research, which concluded that "Alzheimer's disease or similar memory-related diseases appear to have been diagnosed in the league's former players vastly more often than in the national population—including a rate of 19 times the normal rate for men ages 30 through 49."

221.     Despite commissioning the study, the NFL responded to the study's results by claiming it was incomplete and that further findings would be needed.  Several experts in the field found the NFL's reaction to be "bizarre," noting that "they paid for the study, yet they tried to distance themselves from it."

222.     At a series of Congressional hearings in 2009 and 2010 on the issue of head injuries in the NFL, the Defendant and the members of its MTBI Committee continued to deny links between football-related head injuries and heightened rates of dementia, and faced strong criticism from members of Congress.

223.     In particular, at a Congressional hearing in January 2010, Dr. Casson of the MTBI Committee provided written and oral testimony where he stated, "there is not enough valid,

reliable or objective scientific evidence at present to determine whether or not, repeat head impacts in professional football result in long-term brain damage."

224.   In 2010, the NFL re-named the MTBI Committee the Head, Neck and Spine Medical Committee and replaced all of its members.

225.   The members of the new Committee called the data collected by the MTBI Committee "infected", stating, "[w]e all had issues with some of the methodologies described; the inherent conflict of interest that was there in many areas, that was not acceptable by any modem standards or not acceptable to us. I wouldn't put up with that, our universities wouldn't put up with that, and we don't want our professional reputations damaged by conflicts that were put upon us."

226.   For many years, the NFL and its MTBI Committee have been on direct notice of multiple NFL head injuries contributing to cognitive decline in later life, yet Defendant has never amended any of its inaccurate and misleading statements.

### NFL HAS ACKNOWLEDGED ITS DUTY TO PROTECT PLAYERS FROM THE LONG-TERM RISKS OF CONCUSSIONS AND SUB-CONCUSSIVE TBIs

227.   On August 14, 2007, the NFL acknowledged its duty to protect players from the risk of concussions and sub-concussive head trauma by enacting concussion guidelines, many of which stemmed from the NFL's Concussion Summit involving team trainers and doctors, were sent to all current players and other team personnel.

228.   The NFL's 2007 guidelines on concussion management include a whistleblower provision for individuals to report concussions with the League so that a player with a head injury is not forced to practice or play against medical advice.

229.    The NFL's 2007 concussion guidelines also include an informational pamphlet provided to all current NFL players to aid in identifying symptoms of a concussion.

230.    However, the NFL's August 14, 2007 press release accompanying the concussion guidelines denied that "more than one or two concussions lead to permanent problems."

231.    In a statement issued by the NFL on August 14, 2007, Roger Goodell, the Commissioner of the NFL, introduced the NFL's 2007 concussion guidelines by saying, "we want to make sure all NFL players, coaches and staff members are fully informed and take advantage of the most up-to-date information and resources as we continue to study the long-term impact of concussions."

232.    The NFL's Commissioner also stated, "[b]ecause of the unique and complex nature of the brain, our goal is to continue to have concussions managed conservatively by outstanding medical personnel in a way that clearly emphasized player safety over competitive concerns."

233.    The NFL's 2007 concussion guidelines specifically mandate that a player should have normal neurological test results and no concussion symptoms before returning to play.

234.    Defendant acknowledged that the 2007 concussion guidelines were inadequate and insufficient.  As a result, the NFL enacted more strict regulations to handle concussions starting in the 2009 season. Specifically, the NFL announced new rules requiring players who exhibit any significant signs of concussion to be removed from a game or practice and be barred from returning the same day.

235.    Nevertheless, it was not until June 2010 that the NFL finally issued a warning poster and related pamphlet to its players regarding identification of concussions.  This was the

first time the NFL attempted to acknowledge the truth to its active players regarding concussions.

236.    The June 2010 poster and pamphlet warned active players of the long-term risks associated with multiple concussions, including dementia, memory loss, CTE and its related symptoms.  Unlike its previous messages to players, including the 2007 pamphlet, the NFL instructed players regarding reporting possible concussions, treating concussions, and the long-term risk of concussions.  The NFL quoted the Center for Disease Control's conclusions that, "traumatic brain injury can cause a wide range of short or long term changes affecting thinking, sensation, language or emotions."  The NFL further informed players, "[t]hese changes may lead to problems with memory or communication, personality changes, as well as depression and early onset dementia.  Concussions and conditions resulting from repeated brain injury can change your life and your family's life forever."

237.    As of today, Defendant has not warned retired players of the long-term health effects of concussions.

238.    Due to the statements and actions of the NFL and the MTBI Committee, the Plaintiffs did not know, nor did he have reason to know, the long-term effects of concussions and relied on the Defendant to provide reasonable warnings and studies.

239.    The NFL knew that a substantial risk of physical and mental harm to players existed in connection with repeated concussive and sub-concussive blows to the head, to wit: the danger of irreversible brain-damage and/or dementia.  The Defendant consciously, willfully, and deliberately disregarded the safety of others in working to discredit and undermine accepted medical research, and spreading misinformation to players, including Plaintiffs regarding the risks of multiple concussions and repeated sub-concussive TBIs.

42

## COUNT I
## DECLARATORY RELIEF

240.    Plaintiffs repeat and reallege each of the allegations contained in the foregoing paragraphs as if set forth herein at length.

241.    There is a justiciable controversy involving substantial legal interests between Plaintiffs on the one hand and Defendant on the other for which declaration of rights will have practical effect.  In the face of clear medical evidence to the contrary, the NFL refuses to acknowledge that, due to multiple concussions and sub-concussive blows to the head during their NFL careers, retired and former players are at an increased risk of developing debilitating brain disease and other cognitive problems.

242.    Plaintiffs, have no adequate remedy at law in that, while they are at an increased risk of developing brain disease and further cognitive problems, Plaintiffs have not yet suffered those injuries.

243.    Plaintiffs seek a declaration as to the following:

a.    that Defendant knew or reasonably should have known that the multiple concussions and repeated sub-concussive TBIs suffered by Plaintiffs while playing NFL football were likely to put them at excess risk to neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease and/or similar cognitive-impairing conditions;

b.    that Defendant had a duty to advise Plaintiffs of these medical risks;

c.    that Defendant willfully and intentionally concealed from and misled Plaintiffs concerning these medical risks; and

d.    that Defendant thereby recklessly endangered Plaintiffs.

43

## COUNT II
## MEDICAL MONITORING

244.     Plaintiffs repeat and reallege each of the allegations contained in the foregoing paragraphs as if set forth herein at length.

245.     As explained above, NFL players, including Plaintiffs, experienced repeated traumatic brain and head impacts, including but not limited to concussions and sub-concussive blows, during the duration of their respective NFL professional careers, far beyond what is experienced by the average person.

246.     As stated in greater detail above, medical evidence shows that repeated traumatic brain and head impacts, including but not limited to concussions, result in at a significantly increased risk of latent neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease and/or similar cognitive-impairing conditions.

247.     As a result of repeated traumatic brain and head impacts, including but not limited to concussions, during the duration of their respective NFL professional careers, Plaintiffs are at a significantly increased risk of latent neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease or similar cognitive-impairing conditions.

248.     Defendant was fully aware of the danger of exposing players to multiple traumatic brain injuries, including concussive and sub-concussive blows.

249.     Yet Defendant did not warn any players of the medical risks associated with these injuries, and instead attempted to conceal the harmful effects of football-related concussions from players, including Plaintiffs.  Furthermore, Defendant breached its duties of reasonable and ordinary care to the Plaintiffs by failing to protect their physical and mental health and failing to provide necessary and adequate safety information.

44

250.    As a proximate result of Defendant's conduct, Plaintiffs have experienced an increased risk of developing serious, latent, neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease or similar cognitive-impairing conditions.

251.    Monitoring procedures exist that comport with contemporary scientific principles and makes early detection of cognitive impairment possible. Such monitoring includes baseline exams, diagnostic exams, and behavioral and pharmaceutical interventions, which will prevent or mitigate the adverse consequences of the latent neurodegenerative disorders and diseases associated with the repeated traumatic brain and head impacts described herein.

252.    The latent brain injuries for which Plaintiffs are at greater risk require specialized testing that is not generally given to the public.

253.    Such monitoring is different from that normally recommended in the normal medical treatment prescribed for adult males who have not suffered repeated concussions and sub-concussive head trauma.

254.    The prescribed monitoring regime is reasonably necessary according to contemporary scientific principles to test, prevent, mitigate and treat Plaintiffs for neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease or similar cognitive-impairing conditions.

255.    Plaintiffs have no adequate remedy at law in that monetary damages alone cannot compensate them for the risk of long-term physical and economic losses due to concussions and sub-concussive injuries. Without a Court-approved medical monitoring program as described herein, the Plaintiffs will continue to face an unreasonable risk of injury and disability.

256.     Plaintiffs therefore seek an injunction creating a Court-supervised, Defendant-funded medical monitoring regime for Plaintiffs, which will facilitate the early diagnosis and adequate treatment in the event a neurodegenerative disorder or disease is diagnosed.

257.     The medical monitoring regime should include, inter alia:

     a.     a trust fund in an amount to be determined to pay for the medical monitoring of all NFL players as frequently and appropriately as necessary; and

     b.     notification to all Plaintiffs in writing regarding the specific regime recommended and the need for, and importance of, frequent medical monitoring.

258.     Plaintiffs also seek all other necessary relief in connection with this claim.

## COUNT III
## FRAUDULENT CONCEALMENT

259.     Plaintiffs incorporate by reference all facts set forth in the preceding paragraphs as if set forth herein at length and further allege on information and belief as follows.

260.     Prior to 1994, the NFL knew that repetitive head impacts in football games and full-contact practices created a risk of harm to NFL players.

261.     Prior to 1994, the NFL was aware of and understood the significance of the published medical literature demonstrating the serious risk of both short-term and long-term adverse consequences from the kind of multiple concussions and repetitive sub-concussive TBIs to which NFL players were exposed.

262.   The NFL knowingly and fraudulently concealed from NFL players and former NFL players the risks of head injuries, in particular the heightened risk created by returning to the playing field before making a proper recovery from their head injuries.

263.   From 1994 through June of 2010, the NFL voluntarily and repeatedly made material misrepresentations to its players, former players, the United States Congress, and the public at large that there was no evidence linking, or insufficient evidence linking multiple concussions and repetitive sub-concussive TBIs to latent cognitive/brain injury, including CTE and its related symptoms.

264.   Defendant's MTBI Committee published articles, and the NFL issued a concussion pamphlet to players, that affirmatively concealed and downplayed known long-term risks of concussions to NFL players.

265.   The concussion pamphlet created player reliance by Plaintiffs that the NFL would and did carefully undertake its affirmatively adopted responsibility to research, test, study, and report accurate findings to Plaintiffs. The NFL stated that "[w]e want to make sure all NFL players ... are fully informed and take advantage of the most up to date information and resources as we continue to study the long-term impact of concussions."

266.   Further concealment of material information continued in January 2010.  Dr. Casson of the MTBI Committee provided oral and written testimony at the 2010 congressional hearings in which he continued to deny the validity of other studies.

267.   The NFL, therefore, concealed material facts and information with the intent to deceive and defraud, which caused Plaintiffs to become exposed to the harm referenced above. For those Plaintiffs who had retired prior to the above-mentioned misrepresentations, the NFL's concerted concealment of the risks to which they had been exposed on the playing field delayed

their ability to plan for the future of themselves and their families and to seek appropriate treatment of their latent neurodegenerative conditions.

268.    Defendant knew that Plaintiffs, and other NFL players, would rely on the inaccurate information provided by the NFL.

269.    Plaintiffs relied on this inaccurate information during and after their NFL careers.

270.    As a direct and proximate result of the NFL's fraudulent conduct, Plaintiffs have suffered physical injury, including, but not limited to, existing and latent cognitive conditions that create memory loss, diminished cognitive function, non-economic losses, and economic losses.

271.    As a direct and proximate result of the NFL's willful concealment, Plaintiffs have suffered and will continue to suffer substantial injuries, emotional distress, pain and suffering, and economic and non-economic damages that are ongoing and continuing in nature.

272.    As a result of the NFL's misconduct as alleged herein, the NFL is liable to Plaintiffs for, and Plaintiffs seek, the full measure of damages allowed under applicable law.

273.    For the above reasons, Plaintiffs demand judgment against the NFL for an amount in excess of $75,000.00 each and an amount in excess of $5,000,000 overall, compensatory and punitive damages to be determined upon the trial of this matter.

## COUNT IV
## FRAUD

274.    Plaintiffs incorporate by reference all facts set forth in the preceding paragraphs as if set forth herein at length and further allege on information and belief as follows.

275.    Prior to 1994, the NFL knew that repetitive head impacts in football games and practices circumstances created a risk of harm to NFL players.

276.    Prior to 1994, the NFL was aware of and understood the significance of the published medical literature demonstrating the serious risk of both short-term and long-term adverse consequences from the kind of multiple concussions and repetitive sub-concussive TBIs to which NFL players were exposed.

277.    The NFL, however, withheld this information from NFL players and ignored the risks to NFL players.

278.    From 1994 through June of 2010, the NFL and its agents made material misrepresentations to the players, former players, the United States Congress, and the public at large that there was no scientifically proven link between repetitive traumatic head impacts and latent cognitive/brain injury, including CTE and its related symptoms, arising later in life.

279.    The material misrepresentations include the NFL's remarks that players were not at an increased risk of head injury if they returned too soon to an NFL game or training session after suffering a head injury.

280.    Defendant's material misrepresentations included the NFL's criticism of legitimate scientific studies which illustrated the dangers and risks of head injuries and the long-term effects of concussions.

281.    Defendant's material misrepresentations, through its MTBI Committee, denied a link between concussions and CTE and other neurodegenerative diseases and disorders.

282.    The NFL and its agents made such material misrepresentations with the intent to defraud the Plaintiffs.

283.    Defendant had actual knowledge of the misleading nature of these statements when they were made.

49

284.    The Plaintiffs justifiably and reasonably relied on the NFL's omissions and misrepresentations to their detriment.

285.    Defendant had actual knowledge that players, including Plaintiffs, would rely on these misrepresentations.

286.    As a result of the NFL's misconduct as alleged herein, the NFL is liable to Plaintiffs.

287.    The Plaintiffs were damaged by the NFL's misconduct. They have suffered and will continue to suffer substantial injuries, emotional distress, pain and suffering, and economic and non-economic damages that are ongoing and continuing in nature.

288.    As a result of the NFL's fraud, the NFL is liable to Plaintiffs for, and Plaintiffs seek, the full measure of damages allowed under applicable law.

289.    For the above reasons, Plaintiffs demand judgment against the NFL for an amount in excess of $75,000.00 each and an amount in excess of $5,000,000 overall, compensatory and punitive damages to be determined upon the trial of this matter.

## COUNT VI
## NEGLIGENCE

290.    Plaintiffs incorporate by reference all facts set forth in the preceding paragraphs as if set forth herein at length and further alleges on information and belief as follows.

291.    Increasingly, during the 1960s through the 1990s, the NFL marketed the game of football as acceptably violent and it rewarded its most violent players. This marketing technique was directed to the general public, as well as the community of players associated with organized football from sandlot to college.  In pursuing these deliberate marketing strategies, the Defendant knew or should have known that by equating the violence that caused head trauma with heroism

would induce NFL players and those who aspired to play in the NFL to play with reckless violence.

292.   In the early 1990's, the NFL voluntarily undertook to study the issue of neurocognitive injuries in former NFL players.

293.   In 1994, in connection with that voluntary undertaking, the NFL created the aforementioned MTBI Committee.

294.   Defendant affirmatively and voluntarily established the MTBI Committee, ostensibly to examine the dangers and consequences of head injuries to NFL players, to report on its findings, to provide information and guidance from its research and studies concerning concussions to teams and players, and to make recommendations to lessen the risks of concussions.

295.   By voluntarily undertaking to study and report on the issue of the neurocognitive effects of head impacts in professional football, the NFL assumed a duty to exercise reasonable care in the MTBI Committee's work and the NFL and its agents' public statements about the substance of the Committee's work.

296.   However, the MTBI Committee negligently performed the NFL's voluntarily undertaken research mission.

297.   In addition, from 1994 through June of 2010, the NFL and its MTBI Committee made material misrepresentations to players, former players, the United States Congress, and the public at large that there was no scientifically valid link between repetitive traumatic head impacts and latent cognitive/brain injury, including CTE and its related symptoms, arising later in life.

298.    The NFL's failure to exercise reasonable care in its voluntarily assumed duty increased the risk that the Plaintiffs would suffer long-term neurocognitive injuries.

299.    The Plaintiffs reasonably relied to their detriment on the NFL's actions and omissions on the subject.

300.    Under all of the above circumstances, it was foreseeable that the NFL's failure to exercise reasonable care in the execution of its voluntarily undertaken duties would cause or substantially contribute to the personal injuries suffered by the Plaintiffs.

301.    The NFL's failure to exercise reasonable care in the execution of its voluntarily undertaken duties proximately caused or contributed to Plaintiffs' injuries, including but not limited to CTE and multiple cognitive deficiencies.

302.    That by reason of the foregoing negligence on the part of Defendant, Plaintiffs aforesaid injuries are permanent and that they will continue to suffer from the effects of their aforesaid injuries, including but not limited to continuous pain and suffering and severe emotional distress.

303.    As a result of the NFL's negligence, the NFL is liable to Plaintiffs, and the Plaintiffs are entitled to, and seek, all damages allowed by applicable law.

304.    For the above reasons, Plaintiffs demand judgment against the NFL for an amount in excess of $75,000.00 each and an amount in excess of $5,000,000 overall, compensatory and punitive damages to be determined upon the trial of this matter.

## COUNT VII
## NEGLIGENT MISREPRESENTATION

305.    Plaintiffs incorporate by reference all facts set forth in the preceding paragraphs as if set forth herein at length and further allege on information and belief as follows.

306.    A special relationship exists between the NFL and the Plaintiffs sufficient to impose a duty on the NFL to disclose accurate information to the Plaintiffs.

307.    Prior to 1994, the NFL knew that repetitive head impacts in football games and practices created a risk of harm to NFL players.

308.    Prior to 1994, the NFL was aware of and understood the significance of the published medical literature demonstrating the serious risk of both short-term and long-term adverse consequences from the kind of multiple concussions and repetitive sub-concussive TBIs regularly experienced by NFL players.

309.    The NFL, however, withheld this information from NFL players and ignored the risks to NFL players.

310.    From 1994 through June of 2010, the NFL made material misrepresentations to its players, former players, the United States Congress, and the public at large that there was no scientifically proven link between repetitive traumatic head impacts and latent cognitive/brain injury, including CTE and its related symptoms, arising later in life.

311.    The NFL misrepresented the dangers that NFL players faced in returning to play too quickly after sustaining a head injury. Defendant's MTBI Committee, through public statements which it knew or should have known were misleading, published articles and issued the concussion pamphlet to its players downplaying the long-term risks of concussions to NFL players.

312.    Defendant NFL, therefore, misrepresented the dangers the Plaintiffs faced in returning to action after sustaining a head injury and the long-term effects of continuing to play football after a head injury.

313.    The MTBI Committee made material misrepresentations on multiple occasions, including but not limited to testimony at congressional hearings and other information issued to current and former NFL Players.

314.    The Defendant's misrepresentations included the false statement that present NFL players were not at an increased risk of short-term and long-term adverse consequences if they returned too soon to an NFL games or practices after suffering head trauma and, therefore, that former players had not been exposed to such increased risk during their time in the NFL.

315.    The NFL's misrepresentations included ongoing and baseless criticism of legitimate scientific studies that set forth the dangers and risks of head impacts which NFL players regularly sustained.

316.    The NFL made these misrepresentations and actively concealed true information at a time when it knew, or should have known, because of its superior position of knowledge, that the Plaintiffs faced serious health problems if they returned to a game too soon after sustaining a concussion.

317.    The NFL knew or should have known the misleading nature of their statements when they were made.

318.    The NFL made the misrepresentations and actively concealed information knowing that the Plaintiffs would and did rely on the misrepresentations or omissions in, among other things, how the Plaintiffs addressed the concussions and sub-concussive TBIs they sustained.

319.    As a direct and proximate result of the NFL's negligent misrepresentations, Plaintiffs have suffered and continue to suffer serious personal injury, including neuro-cognitive brain disease and associated damages including mental disability, loss of income, pain and

suffering, emotional distress, and loss of consortium. Plaintiffs seek the full measure of damages allowed under applicable law.

320.    For the above reasons, Plaintiffs demand judgment against the NFL for an amount in excess of $75,000.00 each and an amount in excess of $5,000,000 overall, compensatory and punitive damages to be determined upon the trial of this matter.

**COUNT VIII**
**NEGLIGENT HIRING**

321.    Plaintiffs incorporate by reference all facts set forth in the preceding paragraphs as if set forth herein at length and further allege on information and belief as follows.

322.    The NFL voluntarily and gratuitously inserted itself into the business of studying, and rendering purported expert opinions regarding, the relationship between repetitive head impacts in football and brain injury.

323.    In doing so, the NFL assumed a duty to the Plaintiffs and the general public to retain and employ persons within the MTBI Committee who were professionally competent to study and render opinions on the relationship of repetitive head impacts in football to brain injury, to ensure that those whom it hired had no conflict of interest, and to ensure that each Committee member had the professional and personal qualifications to conduct those studies and render opinions that were scientifically rigorous, valid, defensible, and honest.

324.    The NFL breached its duty to the Plaintiffs and the general public by hiring persons who:

      a.    were unqualified;

      b.    were not competent to engage in rigorous and defensible scientific research;

55

c.      were not competent to render valid and defensible opinions;

d.      created fraudulent industry-funded research; and/or

e.      attacked as not credible the valid and defensible research and opinions generated by neuro-scientists who were independent from the NFL.

325.    The NFL's negligence in failing to retain competent and honest persons of the MTBI Committee resulted in a body of falsified industry-funded research that purposefully and/or negligently contested and suppressed valid and truthful bio-medical science. The NFL's negligence allowed the MTBI Committee to use falsified industry-funded research to mislead the Plaintiffs, other former NFL players, and the general public regarding the risks associated with repetitive head impacts in the game of football.

326.    As a result of the NFL's failure, the Plaintiffs have sustained brain injuries that are progressive and latent and did not take protective measures or seek the diagnosis and treatment they would have sought had they been told the truth.

327.    For the above reasons, Plaintiffs demand judgment against the NFL for an amount in excess of $75,000.00 each and an amount in excess of $5,000,000 overall, compensatory and punitive damages to be determined upon the trial of this matter.

**COUNT IX**
**LOSS OF CONSORTIUM**

328.    Plaintiffs incorporate by reference all facts set forth in the preceding paragraphs as if set forth herein at length and further alleges on information and belief as follows.

329.    As a direct and proximate result of the aforementioned conduct of Defendant, and as a result of the injuries and damages to Plaintiffs, their wives:

56

a.     have been deprived of the love, companionship, comfort, affection, society, solace

or moral support, and protection of her spouse;

b.     suffered loss of consortium, loss of services, loss of earnings, and loss of physical

assistance in the operation and maintenance of the home, of her husband; and

c.     will be and will continue to be required to spend money for medical care and

household care for the treatment of her husband.

330.     have thereby sustained, and will continue to sustain damages resulting from

Defendant's wrongful conduct.

331.     For the above reasons, Plaintiff Spouses demand judgment against the NFL for an

amount in excess of $75,000.00 compensatory and punitive damages to be determined upon the

trial of this matter.

## CONCLUSION AND PRAYER

**WHEREFORE**, Plaintiffs requests trial by jury and that the Court grant them the

following relief against the NFL, on all counts of this Complaint, including:

A.     Money Damages representing fair, just and reasonable compensation for their

respective common law claims in excess of $75,000.00 for each Plaintiff and in

excess of $5,000,000 for all of their claims;

B.     Lost Wages;

C.     Punitive and/or Treble Damages pursuant to state law;

D.     All elements of damages recoverable under the law applicable to these claims;

E.     Pre-judgment and post-judgment interests as authorized by law on the judgments

which enter on Plaintiffs' behalf; and

F.     Such other relief as is deemed just and appropriate.

57

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by jury on all matters so triable.

Dated: New York, New York
        November 13, 2013

                           Anthony Tarricone
                           Kreindler & Kreindler, LLP
                           277 Dartmouth Street
                           Boston, MA 02116
                           Telephone: (212) 687-8181
                           Email: atarricone@kreindler.com

                           AND

                           Sol Weiss, Esquire
                           Anapol Schwartz
                           1710 Spruce Street
                           Philadelphia, PA 19103
                           Telephone: (215) 735-1103
                           Email: sweiss@anapolschwartz.com

                           AND, pending admission *pro hac vice*,

                           James Kreindler
                           Noah Kushlefsky
                           Kreindler & Kreindler, LLP
                           750 Third Avenue
                           New York, NY 10017
                           Telephone: (212) 687-8181
                           Email: jkreindler@kreindler.com
                                     nkushlefsky@kreindler.com

                           *Attorneys for Plaintiffs*